# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 04 C 1263 | DATE | 8/16/2004 |
| CASE TITLE | Don Harris vs. Charles Hinsley | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons addressed, the Court denies Harris' petition for a writ of habeas corpus. Harris' motion to supplement issued (30-1) is granted; his motion to proceed in forma pauperis (26-1) is terminated as moot in light of his payment of the filing fee; and his motion for appointment of counsel (27-1) is denied. The Clerk is directed to enter judgment in favor of respondent.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | AUG 17 2004 | |
| | Notified counsel by telephone. | | date docketed | 33 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom | | date mailed notice | |
| TP | deputy's initials | 2004 AUG 16 PM 4:52 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DOCKETED
AUG 17 2004

DON HARRIS, )
)
       Petitioner, )
)
v. ) Case No. 04 C 1263
)
CHARLES HINSLEY,[1] )
)
       Respondent. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

      In 1995, an Illinois jury convicted Don Harris of one count of aggravated criminal sexual assault and two counts of aggravated kidnapping, and he was sentenced to a seventy-five year prison term. The charges against Harris arose allegations he had abducted a fourteen year old girl and her four year old male cousin on a Chicago street and then sexually assaulted the girl at gunpoint. Harris' defense at trial was a claim of consent; in his habeas corpus petition, he contends he paid the girl to have sexual intercourse and that she falsely accused him of sexual assault when he took his money back.

      Harris has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Harris alleges that his constitutional rights were violated by: (1) improper comments by the prosecution during opening and closing arguments that he says concerned his decision not to testify; (2) allowing evidence of his victim's virginity; (3) admission of evidence of a prior similar crime by Harris; (4) admission of an out-of-court statement by the victim's cousin that

---

[1] Charles Hinsley is substituted as the respondent in this case pursuant to 28 U.S.C. § 2254, Rule 2(a).

corroborated the victim's testimony; (5) admission of evidence allegedly seized in violation of the Fourth Amendment; (6) the cumulative impact of the errors at trial; (7) denial of effective assistance of counsel on his post-conviction petition; (8) denial of effective assistance of trial counsel; (10) denial of effective assistance of appellate counsel on post-conviction review; and (11) imposition of a sentence that violated of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). For the following reasons, the Court denies Harris' petition.

**Background**

Factual findings by the state court are presumed correct in a federal habeas corpus proceeding unless they are rebutted by clear and convincing evidence. *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2002); 28 U.S.C. § 2254(e)(1). Harris has raised only one relatively minor dispute with the Illinois Appellate Court's factual findings, so we adopt the following account from the decision of that court in *People v. Harris*, 297 Ill. App. 3d 1073 (1998), including the court's discussion of a motion to suppress evidence that Harris filed, and omitting the one item that Harris disputes:

> On the morning of June 17, 1995, N.G., a 14-year-old girl, awoke around 8:30 a.m. Her aunt asked her if she would go to the store to buy some milk. She and her four-year-old male cousin, R.W., walked to the corner store. On the way home, N.G. saw a man, whom she identified as defendant. He wore a City of Chicago orange construction worker vest. He put a gun against her side and said, "Do you see this[?]" She said "yes." Defendant made N.G. wear some sunglasses that had black tape in the inside of the lens so she could not see. He led them to his car. N.G. was saying "no" and R.W. was crying and saying "no. We want to go home." Defendant put R.W. in the back seat and N.G. in the front seat. When he entered the car, he set the gun by his leg.
>
> As he drove, defendant said N.G. fit the description of a girl who stabbed his sister. N.G. told him that she was not that person. He asked her where she lived and she gave him a false address. He asked her for her name and she told him it was Kiki. He asked her age and she told him 12 years old. He continued to ask her various questions, including whether she was a virgin. She replied "yes" and he said he would know if she was lying.

N.G. stated that she was crying and the tape on the sunglasses started to loosen so that she could see. Defendant stopped the car and said, "I think you can see." He took the sunglasses off, pulled duct tape from his pocket and put it directly on her eyes. He put the sunglasses back on and started to drive again. She was able to see some of the streets because the tape on her eyes became wet and started to loosen. Defendant finally drove to an alley and stopped the car near a garage.

Defendant then pushed the door of the garage open and took them inside. N.G. could see a vehicle on the first floor of the garage. It was a dark black or gray car with red lines. Defendant took them up some stairs. R.W. was crying and saying "no" and stating that he wanted to go home. When they reached the top of the stairs, there was an old red couch and he ordered them to sit. N.G. stated that there were old sales papers, a rolled up carpet, an old gutter, and a lot of dirt and rocks on the floor.

Defendant took her hat and the sunglasses off. He told her to stand up and to lift her shirt so he could unbutton her shorts. He could not get them unbuttoned so he told her to do it. His face was a few inches from her face. She unbuttoned her shorts and he told her to lie down. R.W. was still screaming on the couch. Defendant said that she did not look like she was 12 years old and asked why she was lying. He pulled her shorts and underwear down. N.G. was crying. He then pulled her shirt off over her head and turned her on her stomach. He told her just go along with it and he would not hurt her. Defendant took his penis and put it in her vagina. As she was crying and screaming, he told her to be quiet and threatened to slit her throat. Next defendant turned her on her back and put his penis in her vagina again. He told her to hold her legs up and be quiet. Then defendant ordered her to put her arms around him and hug him. She did so, and she could feel the gun in his back. Then defendant took his penis out of her vagina. He "got mad and jumped up. He turned to [R.W.] and said, thanks for ruining my fun."

Defendant told her to dress and then walked them downstairs where he pulled the tape off her eyes and threw it on the floor. He took a blue rag and tied it around her eyes. He drove them to 54th Street and Wood, which was about four blocks from the store where she had purchased the milk. He told her that he was glad she had cooperated with him and that she "was the first one he didn't kill." He walked them to the middle of the street. He told them to walk home and said that if they turned around he would shoot them. He threatened to kill them if they said anything. Then he untied the blindfold. After she made sure he was gone, N.G. ran with R.W. to her grandmother's house.

When they arrived at the house, N.G. told her aunt what happened and her aunt called the police. When a police officer arrived, N.G. led him to the garage where the assault occurred. She identified defendant's vehicle, a gray Riviera. Later she identified a gun as the one defendant had used during the assault. N.G. went to the hospital where she was examined by medical personnel and she went to the police station that afternoon and identified defendant from a lineup.

3

Defendant was charged with various counts related to these events, including criminal sexual assault, aggravated sexual assault, armed violence and aggravated kidnapping. Defendant moved to quash his arrest and suppress evidence.

At the suppression hearing, Officer Vernon Mitchell testified that he and other officers were called to defendant's residence on July 17, 1995, sometime after 9 a.m. They were to assist other officers in the possible apprehension of a criminal sexual assault suspect. Upon arriving at the scene, he was informed as to the details of the assault as given by N.G. Officer Mitchell spoke with a person on the street and learned that a man had gotten out of the gray car in front of the residence with a brown paper bag and had gone into the house a few minutes before the other officers had arrived.

The officers rang the doorbell and knocked but did not receive an answer. A girl, later identified as defendant's daughter Lokeya Caldwell, came to the window on the second floor. She appeared to be between 11 and 13 years old. She was visibly upset, shaken and crying. The officers told her to come to the door and eventually she did so, but she only opened the inner door. She said she was alone and that her father had locked her in and gone to work. She closed the door and left the doorway. The officers began calling to the girl. They were concerned for her safety and called the fire department. The officer stated, "We had no idea who was in the house with her, if something was wrong with her or not, so we called the fire department." He also stated they were aware that the victim had identified the car. "Maybe he might have been holding her hostage or something like that. We really weren't sure at all."

When the fire department arrived about five minutes later, they put a ladder up to the window on the second floor and the officers entered the house. Officer Mitchell found the girl and asked her if she was okay and what was happening. She was still shaking and crying. She told him in a whisper "he's in the house." The other officers proceeded downstairs. The girl told Officer Mitchell that it was her father who was in the house and he had come in excited, running around with a bag that he was trying to hide, and saying that the police were coming to get him for something he did not do.

In going through the residence, the other officers found a shotgun in the second-floor bedroom under the bed, a "Tek-9" in a closet also in the bedroom and two additional guns in a brown paper bag on the second floor in an oven. One of the officers heard some noise in the basement and went downstairs to find defendant . . . .

Officer Mitchell asked the girl to call her mother. When Linda Caldwell arrived about 5 to 10 minutes later, the officers explained what happened and why they were there. Ms. Caldwell signed a form, stating:

"I, Linda Caldwell, give permission to Chicago police officers to search my residence at 5315 South Laughlin on June 17, 1995, and take out of my residence any illegal

4

weapons."

The officers explained to her that the form was to search the house and the other properties. The officer said she was "very cooperative," stating that she wanted to see for herself. Ms. Caldwell led them through the yard, moved the family's dogs to allow the officers to pass, unlocked the gates, and let them into the garage.

When they entered the garage, the officers found two pieces of duct tape on the car in the garage with a red stripe. They went upstairs and found two orange safety vests, a red couch, carpeting, and crumpled up newspapers. They also recovered some blue rags and a pair of sunglasses.

Lokeya Caldwell testified that she was watching television in an upstairs bedroom on June 17, 1995, when her father came home and went to sleep. After about 15 minutes, she went to the window and saw a fire truck and police officers. One of the policemen called up to her. She told them that her father was home. When he asked her to come down and open the door, she woke her father, who told her to go to her room. The police came into the house through the window. She was upset, but denied crying.

Linda Caldwell testified that she signed a piece of paper that morning but stated that she was told that she had to sign it to get her property back. She did not read it before signing and the police did not tell her it was a consent to search form. No police officer asked her for consent to search her house. She stated that she refused to open the garage and the officers took her keys and opened the lock. When asked if she was cooperative, she said, "I had no other choice."

. . .

The case proceeded to trial, where N.G. and others testified. Louevetta W., N.G.'s aunt and R.W.'s mother, testified that when R.W. returned that morning he was crying, hysterical and scared. His eyes were red and puffy as if he had been crying for an extended period of time. She also stated that N.G. appeared frightened and was shaking and crying. Her hair was disarrayed over her head and her clothes were dirty.

The court allowed L.E. to testify as evidence of another sexual assault alleged to have been by defendant. L.E. testified that on March 25, 1995, she was 17 years old. At approximately 9 a.m. she was waiting for a bus when defendant approached and asked if she had change for a dollar. He grabbed her arm and she felt a gun barrel to her back. He said, "don't scream or I will shoot you." He told her to get into his car, a two-door gray Riviera. He told her to lay her head in his lap. He moved the gun to the back of her head and proceeded to drive.

Defendant then started asking her personal questions, such as, her name, her age, who she

5

lived with, and where was she going. He asked her if she had sucked anyone's penis before and she said "no." He said, "well, you are about to today" and she started crying. He unzipped his overalls, raised his shirt, and pushed her head down to his penis. His penis was in her mouth for 5 to 10 minutes. She told him she could not breath and he told her "he didn't give a fuck, bitch." He then zipped his pants back up and told her to lay her head back down. He asked her if she had ever had sex and she said "no." "He said don't lie to me." Then he said, "so you are a virgin, huh." She said "yes." He said, "you are about to find out."

He stopped the car and made her get out. He told her to close her eyes and put her hands around him. She did so, but she could see somewhat. They went into an abandoned building and he kissed her. He told her to take her clothes off and to lie down on an old mattress. He put his penis in her vagina. He was not able to put it in all the way and her "lower body kind of hopped up." He told her to shut up and lie back down. He said he would kill her if she moved again. Then he put his penis in her vagina again. After 10 to 15 minutes he got up and told her to dress. Then he walked over to her and ordered her to hug him.

Defendant then took her out of the building and he told her to get back in the car. He told her he would kill her if the police ever found out. He took her to another abandoned building, directed her to remain in the building for at least 10 minutes and left. Eventually, she came out and walked home. He had left her about one block from where he had picked her up. On June 17, 1995, L.E. identified defendant in a lineup as her attacker. She also identified the gun that he had used. On cross-examination, she stated that the man who attacked her had on a hood and wore sunglasses.

The defense theory in the case suggested that N.G. consented to having sex. Defendant did not testify but offered several witnesses. Desiree Weeks testified that she saw defendant standing by his car near the store that morning. She stated that she saw a young lady with a little boy approach him and have a conversation for about 30 to 40 minutes. She saw the lady attempt to open the passenger door of defendant's car, but defendant had to come around to open it. She saw them sit in the car and converse for another 15 minutes before driving away. On cross-examination, she admitted that Ms. Caldwell initially asked her to testify and that she had told an investigator that she saw them talking for a few minutes, rather than 30 to 40 minutes.

Irene Scroggins, a bus driver, testified that defendant assisted her that morning at an Amoco station when she locked her keys in her car. She heard a woman yelling from the front seat of defendant's car, stating that she was ready to go. There was a small head in the back seat. On cross-examination, Scroggins admitted that she had said in her statement that the woman that she saw appeared to be in her late twenties or thirties. She also was not certain of the gender of the person in the back seat. While Ms. Scroggins was uncertain as to the exact time of these events she stated at one point that she started

her work break about 7:40 a.m. that morning and she went to the gas station thereafter. Other evidence indicated that defendant had driven his wife to work that morning sometime before 8 a.m.

John Davis, defendant's neighbor, testified that he saw a lady and a child in defendant's car parked next to defendant's garage that morning. He did not see defendant and the lady did not say anything to him as he walked by. This was several hours before the police arrived that morning. On cross-examination, Davis admitted that he would not talk to the State's investigators when they came to question him because he had been drinking that day.

*People v. Harris*, No. 1-96-2641, slip op. at 1-10 (Ill. App. June 30, 1998).

## Discussion

### 1.    Claims 1, 2, 4 and 6

A federal habeas petitioner procedurally defaults a claim when he fails to raise the claim in one or more state courts at the time and way required by the state, *see, e.g., Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996), or when the state court disposed of the claim not on its merits but rather based on an independent and adequate state procedural ground, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), which occurs when "the last state court rendering judgment in the case 'clearly and expressly' states that its judgment rests on the state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989).

The state procedural ground is "independent" when it alone can dispose of the claim without addressing the claim's merits. Courts sometimes dispose of issues on procedural grounds but then go on to examine the merits. But "even if the state court's review in applying a procedural rule is 'entangled' with the merits, that 'entanglement' is not sufficient to compromise the procedural default." *Rodriguez v. McAdory*, 318 F.3d 733, 735-36 (7th Cir. 2003) (citing *Carey v. Saffold*, 536 U.S. 214 (2002)). Instead, "to open up the issue for review by the federal

habeas court, the state court's review must be 'entirely dependent on the merits (as opposed to just 'entangled' with the merits).'" *Id.* (quoting *Brooks v. Walls*, 301 F.3d 839, 843 (7th Cir. 2002)). The state procedural ground is "adequate" when the procedural ground is a "firmly established and regularly followed state practice." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

A procedural default may be excused for purposes of a habeas corpus petition if the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "Cause" must be something outside of the petitioner's control, "something that cannot fairly be attributed to him," *id.* at 753, and actual prejudice exists when there is a "reasonable probability that the issue not raised would have altered the outcome of the [state court] appeal had it been raised." *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003). The fundamental miscarriage of justice exception only applies where the petitioner can show that he is actually innocent of the crime of which he was convicted. *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003). He "must come forward with 'new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). The petitioner must also show that more likely than not, in light of this new evidence, "no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327.

Claims 1, 2, and 4, namely, Harris' claims that the prosecution violated his Fifth Amendment right not to testify by allegedly commenting during closing argument on his failure to testify; that admitting the victim's statements of virginity violated due process; and that

8

admitting the out-of-court statement by the victim's cousin violated Harris' Sixth Amendment right to confront witnesses, were held by the Appellate Court to have been waived. *See Harris*, slip op. at 19-24. Harris argues that the court did not rely on waiver as an independent ground because it also addressed the merits of the claims. It is true that the court addressed the merits of these claims, but it did so only as an alternative holding after finding that the first two issues had been waived because they had not been included in Harris' written post-trial motion as required by Illinois law, and that the third had been waived because no contemporaneous objection was made to the testimony. *See id.* Because these rulings were alternative holdings made only after clear and express statements that each of the issues had been waived, waiver was an independent and adequate state-law basis for ruling against Harris sufficient to establish a procedural default. *See, e.g., Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003). Claim 6, the assertion that cumulative errors denied Harris a fair trial, was defaulted because Harris did not include it in his petition for leave to appeal to the Illinois Supreme Court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (issue must be raised at all levels of state court review to be preserved for purposes of federal habeas corpus petition).

As indicated earlier, a procedural default can be overcome by a showing of cause and prejudice. Harris claims that his trial counsel's ineffective assistance and conflict of satisfies this standard. Specifically, he argues that the conflict of interest "resulted in counsel neglecting to file an adequate motion for new trial as required by the statute." Response to Answer at 10. Harris argues that his trial counsel's "failure to preserve the issues is objectively deficient and even [amounts] to ineffective assistance." *Id.* at 11. Ineffective assistance of counsel and conflict of interest can establish cause for a procedural default. *Coleman*, 501 U.S. at 754 (ineffective

9

assistance); *Barnhill v. Flannigan*, 42 F.3d 1074, 1077-78 (7th Cir. 1994) ("an attorney's actual conflict of interest can be sufficient cause to excuse a procedural default"). But a habeas corpus petitioner must scale another hurdle before he can rely on ineffective assistance of counsel to excuse a procedural default: he must also have raised in the state courts the particular claim of ineffective assistance upon which he relies as the excuse. *See Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000); *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998).

Harris did argue ineffective assistance of trial counsel in his post-conviction petition. But that argument addressed other issues; Harris did not argue in his post-conviction petition that counsel was ineffective for failing to file an adequate post-trial motion or for failing to object to the hearsay evidence at trial. For this reason, under *Edwards* these contentions cannot be relied on to excuse the procedural default, unless Harris can satisfy the "cause and prejudice" standard with respect to these claims as well. *See Edwards*, 529 U.S. at 450-51. Harris has not done so. He has submitted letters from his post-conviction appellate counsel, who advised that he would not raise Harris' ineffective assistance claim on appeal. But this could only have been a reference to the particular claims Harris had raised in his post-conviction petition, which as noted above are different from the claim he now makes to excuse the default of issues 1, 2, 4 and 6. Thus appellate counsel's advice does not excuse the default on the ineffective assistance issue asserted as the excuse. Harris' claim of "plain error," asserted in a motion he filed to supplement his response memorandum, likewise does not excuse the default.

Harris likewise cannot overcome the default via the "miscarriage of justice" exception, as he has not offered clear and convincing evidence that shows that he was actually innocent. He claims that the evidence of his guilt was not overwhelming as respondent suggests, but that

contention is insufficient to establish the exception.

For these reasons, the Court finds that claims 1, 2, 4 and 6 were procedurally defaulted and cannot properly be addressed on their merits.

**2.    Claim 8**

In claim 8, Harris alleges that his trial counsel was ineffective in various respects. Specifically, he contends his trial counsel: (a) failed properly to present a consent defense to the charges; (b) failed to present purportedly exculpatory evidence regarding whether Harris matched the physical description given by the victim; (c) failed to impeach, with an alleged prior inconsistent statement, a witness who testified to the other sexual assault by Harris; (d) did not present alibi witnesses concerning that assault; (e) did not present a witness who allegedly would have testified that Harris could not have had the gun he was claimed to have used in the assault on the day of the other similar assault; (f) prevented Harris from testifying by giving him erroneous advice regarding counsel's ability to argue a consent defense without Harris' testimony; (g) did not advise Harris of his right to testify and present mitigating evidence at sentencing; (h) failed to present at sentencing alibi evidence regarding a third assault said to have been committed by Harris that was evidently used in aggravation; and (i) failed to present mitigating evidence at sentencing due to a conflict of interest arising from the fact that Harris had, at that point, accused counsel of misconduct. *See* Petition at 23-25, 27.

Harris raised each of these issues in his state post-conviction petition.[2] The trial court

---

[2] Respondent, evidently believing that Harris' alibi argument concerned the offense of conviction, argues that that particular issue was not presented in his post-conviction petition. But upon careful examination, it appears that the alibi referenced by Harris concerned an April 28, 1995 assault (not the June 21, 1995 assault for which he was convicted), *see* Petition at 24, and that issue was indeed raised in the post-conviction petition. *See* Answer, Ex. F at 18-20.

11

issued a written decision denying several of the claims without an evidentiary hearing, *see* Answer, Ex. L, and it later issued a second written decision denying two claims on which it had held a hearing. *See* Answer, Ex. G. On appeal, Harris was represented by the Office of the State Appellate Defender. Harris says that when he learned that his appointed counsel planned to raise only the *Apprendi v. New Jersey* issue on appeal, he asked counsel to raise, in addition, the claim that his post-conviction counsel at the trial court level had rendered ineffective assistance with regard to DNA testing that Harris had requested. *See* Response to Answer at 27 & Ex. B-1. Counsel declined to do so and suggested that Harris request leave of court to file a *pro se* supplemental brief. *See id.*, Ex. B-1. Counsel repeated this advice when he filed the appeal brief. *See id.*, Ex. B-2. Harris requested leave to file a supplemental brief; he says that in the proposed brief, he argued that his appellate post-conviction counsel was ineffective for failing to raise issues, and he also "alleged that he did not receive a reasonable level of assistance by his post conviction counsel, for his mis-handling of the D.N.A. procedures . . . and his negligence of presenting a conflicting and contradicting affidavit of a witness, to the court during the post conviction hearing." Response to Answer at 37. The appellate court denied leave to file the supplemental brief. *See id.*, Ex. E. Harris asked his counsel by letter whether he could appeal this ruling; counsel replied that "[y]ou do not need to appeal the denial of your request to file a supplemental brief to make a record or exhaust your state remedies." *Id.*, Ex. L.[3]

---

[3] Counsel's advice that Harris did not need to present his claim to the Illinois Supreme Court in order to preserve it was bad advice. It has been clear since at least *O'Sullivan v. Boerckel, supra,* which was decided three years before counsel's communication with Harris, that an issue is not deemed exhausted for purposes of federal habeas relief unless it is presented at all levels of the state court system, including the Illinois Supreme Court. But this bad advice did not, in the particular circumstances of this case, impact Harris' ability to raise the claims of ineffective assistance of trial counsel that Harris asserts in his habeas corpus petition, as Harris never sought to raise those claims even in his proposed supplemental brief to the Illinois Appellate Court.

12

The claims that Harris has made in his habeas corpus petition regarding the alleged ineffective assistance of his trial counsel were not raised in the appeal brief filed by his counsel, or in the proposed supplemental brief that Harris himself sought to file. The failure to raise these issues constituted a procedural default. Harris suggests that his post-conviction appellate counsel was ineffective for failing to raise these issues, but because he had no federal constitutional right to counsel in the post-conviction proceeding, counsel's alleged failings cannot serve as the basis for "cause" to excuse the procedural default. *See Coleman,* 501 U.S. at 752-54. Claim 8 cannot properly be addressed on its merits.

### 3.   Claims 7, 9, and 10

In claims 7, 9 and 10, Harris argues that his post-conviction counsel was ineffective in various respects. Because there is no federal constitutional right to post-conviction counsel, the Court denies each of these claims. *See, e.g., Coleman,* 501 U.S. at 752-54; *Neal v. Gramley,* 99 F.3d 841, 843 (7th Cir. 1996).

### 4.   Claim 5

Harris argues in claim 5 that his Fourth Amendment rights were violated when the trial court found that evidence seized from his home was admissible under the inevitable discovery doctrine even though the search was illegal. When the state has provided for "a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 494 (1976). If the state provides a mechanism for litigation of the Fourth Amendment claim that is not a sham, *Stone* blocks habeas review of the claim. A sham would exist "if the judge had his mind closed to the necessity of a

13

hearing, or was bribed, or decided . . . that probable cause was not required in Illinois, or was sleepwalking . . . or in some other obvious way subverted the hearing." *Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir. 2003). In this case, a full and fair suppression hearing was held, and Harris received a full review of his Fourth Amendment claims on appeal. Thus *Stone* bars review of these claims on their merits.

5. **Claims 3 and 11**

Harris properly preserved his claims that admission of other crimes evidence violated due process (claim 3), and that his sentence violated *Apprendi* (claim 11). The state court reviewed the latter claim on its merits, and thus we review the claim under the standards established by the amendments to the habeas corpus statute contained in the Antiterrorism and Effective Death Penalty Act of 1996. Under those standards, a writ of habeas corpus may issue only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established law as determined by the United States Supreme Court, or if the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) & (2). A state court decision is contrary to clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision may be overturned under the "unreasonable application" clause when "the state court identifies the correct governing legal principle from [the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Unreasonable, in this context, means "something . . . lying well outside the boundaries of permissible differences of

opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

In addressing Harris' *Apprendi* claim on post-conviction review, the Illinois Appellate Court held that *Apprendi* did not apply retroactively on collateral review. *See People v. Harris*, No. 1-00-3860, slip op. at 4 (Ill. App. Dec. 12, 2002). This ruling was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. *See Lambert v. McBride*, 365 F.3d 557, 562 (7th Cir. 2004) ("the rule in *Apprendi* is not retroactive").

Claim 3 is Harris' claim that evidence of other crimes was improperly admitted at trial. Specifically, he argues that the trial court violated his right to a fair trial by admitting evidence of prior sexual assaults that he was claimed to have committed.[4] The first question involves the standard of review. The AEDPA standard previously discussed applies only if the state court addressed the federal constitutional claim on the merits. *See Dye v. Frank*, 355 F.3d 1102, 1107 (7th Cir. 2004) (citing *Moore v. Parke*, 148 F.3d 705, 708 (7th Cir. 1998)). If the state court did not do so, the federal habeas court follows pre-AEDPA standards, under which we "presume that questions of fact decided by the state court are correct, while questions of law or mixed questions of law and fact are reviewed *de novo*." *Id.* (internal citations omitted). It is unclear whether Harris' federal fair trial claim was adjudicated on its merits by the Appellate Court; the court addressed the issue in terms of Illinois evidence law, holding that the evidence was properly admitted to show that Harris did not act with innocent intent and to show *modus operandi*. *Harris*, No. 1-06-2641, slip op. at 16-19. Though the same considerations discussed by the court are likewise pertinent with regard to Harris' federal fair trial issue, because the state court did not address the issue in fair trial terms, out of an abundance of caution we will assume that the pre-

---

[4] Respondent does not argue that Harris failed to fairly present his federal claim in state court.

15

AEDPA *de novo* standard of review applies.

Admissibility of evidence is generally a matter of state law. To entitle a habeas corpus petitioner to relief, an evidentiary ruling "must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999). An evidentiary ruling compromises this right only when "the error . . . produced a significant likelihood that an innocent person has been convicted." *Id.* (citing *Thompkins v. Cohen*, 965 F.2d 330, 333 (7th Cir. 1992)). Harris cannot meet this strict standard. He has failed to show that the trial court's evidentiary ruling was even erroneous, much less that it allowed the conviction of an innocent man. The prior crime was sufficiently similar to be relevant. As the appellate court indicated, both crimes involved attacks against young women made at gunpoint on the street in the same general area of Chicago. Both victims were taken from the spot of the attack in a gray Riviera to an isolated location and were forced to keep their eyes shut and asked very personal questions, including questions regarding their virginity. The crimes were committed within a short interval, specifically, both took place in 1995. In *Enoch v. Gramley*, 70 F.3d 1490, 1504-05 (7th Cir. 1995), the Seventh Circuit upheld the state court's admission of other crimes evidence to prove intent. Enoch had tried to gain both victims' confidence through asking the same questions; both crimes were committed at knifepoint; and they occurred two months apart. Those similarities are not as great as those in Harris' case. Moreover, the trial court in Harris' case issued a limiting instruction to the jury, saying the other crimes evidence "is being offered solely on the issues of identification, presence and intent, motive and knowledge and design, and may be considered by you only for this limited purpose." R. C-246. For these reasons, the trial court's admission of other crimes evidence did not violate

16

Harris' federal constitutional right to a fair trial.

## Conclusion

For the reasons addressed above, the Court denies Harris' petition for a writ of *habeas corpus*. Harris' motion to supplement issue [docket # 30-1] is granted; his motion to proceed *in forma pauperis* [# 26-1] is terminated as moot in light of his payment of the filing fee; and his motion for appointment of counsel [# 27-1] is denied. The Clerk is directed to enter judgment in favor of respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 16, 2004